No. 16-1024

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

OHIO VALLEY ENVIRONMENTAL COALITION, WEST VIRGINIA HIGHLANDS CONSERVANCY, and SIERRA CLUB

*Plaintiffs-Appellees/Cross-Appellants,*

v.

FOLA COAL COMPANY, LLC

*Defendant-Appellant/Cross-Appellee.*

On Appeal from the United States District Court
for the Southern District of West Virginia at Huntington
Case No. 2:13-cv-5006, Honorable Robert C. Chambers

# OPENING BRIEF FOR THE DEFENDANT-APPELLANT FOLA COAL COMPANY, LLC

M. SHANE HARVEY
ROBERT G. MCLUSKY
JENNIFER L. HUGHES
JACKSON KELLY PLLC
500 Lee Street E, Suite 1600
P.O. Box 553
Charleston, WV 25322
(304) 340-1000

*Counsel for Defendant-Appellant/Cross Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 16-1024 Caption: Ohio Valley Envtl. Coal., Inc., et al. v. Fola Coal Co., LLC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Fola Coal Company, LLC
(name of party/amicus)

who is Appellant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☑ YES ☐ NO
If yes, identify all parent corporations, including all generations of parent corporations:
CONSOL Energy, Inc., a publicly traded corporation, is the ultimate parent corporation of Fola Coal Company, LLC.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☑YES ☐NO
If yes, identify entity and nature of interest:
As the ultimate parent corporation of Fola Coal Company, LLC, CONSOL Energy, Inc. has a direct financial interest in the outcome of the litigation.

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Jennifer L. Hughes Date: 1/21/16

Counsel for: Fola Coal Company, LLC

## CERTIFICATE OF SERVICE

**************************

I certify that on 1/21/16 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Jennifer L. Hughes
(signature)

1/21/16
(date)

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

A. Legal Background .......... 3

1. Surface Mining Control and Reclamation Act .......... 3

2. Clean Water Act .......... 4

a. Water Quality Standards: Numeric and Narrative .......... 5

b. Effluent Limits .......... 6

c. CWA Citizen Suits and Permit Shield .......... 9

B. Factual Background .......... 12

1. West Virginia's Policies Regarding Narrative Water Quality Standards .......... 12

2. OVEC's Efforts to Force WVDEP to Impose Effluent Limits on Conductivity .......... 15

3. Fola's NPDES Permit .......... 17

C. Procedural Background .......... 20

SUMMARY OF THE ARGUMENT .......... 23

ARGUMENT .......... 28

I. The District Court Erred By Determining That Fola Was Subject to CWA Liability .......... 28

A. Like the Permit in *Piney Run*, Fola's Permit Contains a Provision Subject to Multiple Interpretations .......... 30

B. Extrinsic Evidence Demonstrates That West Virginia Intended To Shield Permittees Like Fola .......... 34

1. Guidance From WVDEP .......... 35

2. Clarifications by the Legislature and WVDEP .......... 38

3. Contemplation of the Parties .......... 40

C. Fola is Shielded from CWA Liability .......... 43

II. The District Court Erred by Finding Fola in Violation of Water Quality Standards Created by the District Court ....................44

A. Fola Was Deprived of Fair Notice ....................46

B. The District Court Erred by Using the WVSCI as the Measure of Compliance with the Narrative Standards ....................48

C. The District Court Erred by Imposing a Limit on Conductivity ....................51

III. If the District Court's Rulings Are Construed as Finding Fola Liable for Violations Under SMCRA, Those Rulings Were Wrong as a Matter of Law and Should Be Reversed ....................54

REQUEST FOR ORAL ARGUMENT ....................56

CONCLUSION ....................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altamaha Riverkeeper Inc. v. Rayonier, Inc.*,
No. CV 214-44, 2015 WL 1505971 (S.D.Ga. Mar. 31, 2015) ....33

*Am. Paper Inst., Inc. v. EPA*,
996 F.2d 346 (D.C. Cir. 1993) ....7

*Atl. States Legal Found., Inc. v. Eastman Kodak Co.*,
12 F.3d 353 (2d Cir. 1993) ....9, 41, 43

*Atl. States Legal Found., Inc. v. Eastman Kodak Co.*,
809 F.Supp. 1040 (W.D.N.Y. 1992), *aff'd*, 12 F.3d 353 (2d Cir. 1993) ....6, 12

*Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of New York*,
273 F.3d 481 (2d Cir. 2001) ....52

*Cohn v. G. D. Searle & Co.*,
784 F.2d 460 (3d Cir. 1986) ....47

*Cole v. Ruidoso Mun. Schools*,
43 F.3d 1373 (10th Cir. 1994) ....2

*Defenders of Wildlife v. EPA*,
415 F.3d 1121 (10th Cir. 2005) ....49

*E.I. du Pont de Nemours & Co. v. Train*,
430 U.S. 112 (1977) ....11, 48

*EPA v. California*,
426 U.S. 200 (1976) ....6

*Florida Clean Water Network, Inc. v. EPA*,
No. 4:09CV165, 2012 WL 1072216 (N.D. Fla. March 30, 2012) ....49

*Friends of the Earth v. Gaston Copper Recycling Corp.*,
204 F.3d 149 (4th Cir. 2000) ....24

*Glass v. Dachel*,
2 F.3d 733 (7th Cir. 1993) ....................................................................2

*Kentuckians for the Commonwealth v. Rivenburgh*,
317 F.3d 425 (4th Cir. 2003) ..................................................................3

*Ky. Waterways Alliance v. Johnson*,
540 F.3d 466 (6th Cir. 2008) ..................................................................49

*Nat'l Mining Ass'n v. Jackson*,
880 F.Supp.2d 119 (D.D.C. 2012), *rev'd sub nom, Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014)..........................................15

*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014)...........................................................15, 16

*Natural Res. Def. Council, Inc. v. Cty. of Los Angeles*,
725 F.3d 1194 (9th Cir. 2013) ................................................................33

*New York v. United States*,
620 F.Supp. 373 (E.D.N.Y. 1985) ..........................................................51

*Northwest Envtl. Advocates v. City of Portland*,
56 F.3d 979 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 2500 (1996) ...............41, 42

*Oregon Nat. Res. Council v. U.S. Forest Service*,
834 F.2d 842 (9th Cir. 1987) ..............................................................10, 41

*OVEC v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ..............................................................3, 4

*OVEC v. Elk Run Coal Co., Inc.*,
24 F.Supp.3d 532 (S.D.W.Va. 2014)......................................................*passim*

*OVEC v. Elk Run Coal Co., Inc.*,
No. 3:12-cv-0785, 2014 WL 29562 (S.D.W.Va. Jan. 3, 2014)..........................21

*OVEC v. Fola Coal Co., LLC*,
No. 2:12-cv-3750, 2013 WL 6709957 (S.D.W.Va. Dec. 19, 2013)...................21

*OVEC v. Fola Coal Co., LLC*,
No. 2:13-cv-3750, 2014 WL 5444392 (S.D.W.Va. Oct. 23, 2014) ...................36

*OVEC v. Marfork Coal Co., Inc.*,
966 F.Supp.2d 667 (S.D.W.Va. 2013)........................................................*passim*

*In re Permanent Surface Mining Regulation Litigation*,
627 F.2d 1346 (D.C. Cir. 1980)..................................................................55

*Piney Run Pres. Ass'n v. Co. Comm'rs of Carroll Co., Md.*,
268 F.3d 255 (4th Cir. 2001) ........................................................*passim*

*S. Appalachian Mountain Stewards v. A&G Coal Corp.*,
758 F.3d 560 (4th Cir. 2014) ..............................................................7, 11

*Sierra Club v. ICG Hazard, LLC*,
781 F.3d 281 (6th Cir. 2015) ........................................................10, 41, 55

*Sierra Club v. ICG Hazard, LLC*,
No. 11-148-GFVT, 2012 WL 4601012 (E.D. Ky., Sept. 28, 2012),
*aff'd,* 781 F.3d 281 (6th Cir. 2015)...................................................6, 10, 12

*Sierra Club v. Patriot Mining Co., Inc.*,
No. 13-0256, 2014 WL 2404299 (W.Va. May 30, 2014) ........................5, 15, 16

*Simpson Tacoma Kraft v. Dep't. of Ecology*,
835 F.2d 1030 (Wash. 1992) .......................................................................49

*State of N. Y. v. U.S.*,
620 F.Supp. 374 (E.D.N.Y. 1985) ..........................................................10, 41

*U.S. v. Hoechst Celanese Corp.*,
128 F.3d 216 (4th Cir. 1997) .......................................................................47

*U.S. v. Metro. Dist. Comm'n*,
679 F.Supp. 1154 (D.Mass. 1988).................................................................50

*Va. Dept. of Transp. v. EPA*,
No. 1:12-cv-775, 2013 WL 53741 (E.D.Va. Jan. 3, 2013) ...............................53

*Victor Talking Mach. Co. v. George*,
105 F.2d 697 (3d Cir. 1939) ..........................................................................2

*Westvaco Corp. v. EPA*,
899 F.2d 1383 (4th Cir. 1990) .......................................................................7

*Wisconsin Res. Prot. Council v. Flambeau Min. Co.*,
727 F.3d 700 (7th Cir. 2013) ....................................................46, 47

**Statutes**

28 U.S.C. § 1291 ....................................................1

28 U.S.C. § 1292(a)(1) ....................................................2

28 U.S.C. § 1331 ....................................................1

30 U.S.C. §§ 1201, *et seq*. ....................................................3

30 U.S.C. § 1270 ....................................................1

30 U.S.C. § 1292(a)(3) ....................................................55

33 U.S.C. §§ 1251, *et seq*. ....................................................4

33 U.S.C. § 1311(a) ....................................................4

33 U.S.C. § 1311(b)(1)(C) ....................................................49

33 U.S.C. § 1313 ....................................................5, 9, 49

33 U.S.C. § 1313(d) ....................................................13

33 U.S.C. § 1342 ....................................................4, 9

33 U.S.C. § 1342(k) ....................................................10

33 U.S.C. § 1344 ....................................................4

33 U.S.C. § 1362(11) ....................................................39

33 U.S.C. § 1362(16) ....................................................52

33 U.S.C. § 1365 ....................................................1

33 U.S.C. § 1365(a) ....................................................9

33 U.S.C. §1365(f) ....................................................39

33 U.S.C. § 1365(f)(2) ....................................................9

33 U.S.C. § 1365(f)(6) ....................9, 20

W. Va. Code §§ 22-11-1 to -30....................4

W. Va. Code § 22-11-3(8) ....................39

W. Va. Code § 22-11-6(2) ....................11, 40

W. Va. Code § 22-11-7b(f) ....................15

W. Va. Code § 22-11-8 ....................7

W. Va. Code § 22-11-8(a)....................40

W. Va. Code § 22-11-11(c)....................9

W. Va. Code § 22-11-21 ....................9

WVCSR § 38-2-5.4.a ....................4

WVCSR § 47-2-3.2.e ....................6

WVCSR § 47-2-3.2.i....................6, 8

WVCSR § 47-2-8, Appendix E, Table 1 ....................5

WVCSR § 47-3-6.2.a ....................7

WVCSR § 47-3-6.2.c ....................7

WVCSR §§ 47-30-1 to -15 ....................4

WVCSR § 47-30-2.16....................52

WVCSR § 47-30-3....................7

WVCSR § 47-30-3.4.a ....................11

WVCSR § 47-30-4.5.a.9 ....................8

WVCSR § 47-30-4.5.b....................8

WVCSR § 47-30-5.1 ....................19

WVCSR § 47-30-5.1.a ....................33

WVCSR § 47-30-5.1.b ........................................................................33

WVCSR § 47-30-5.1.f ........................................................................*passim*

WVCSR § 47-30-5.2 ........................................................................33

WVCSR § 47-30-5.5 ........................................................................33

WVCSR § 47-30-5.6 ........................................................................34

WVCSR § 47-30-5.7 ........................................................................34

WVCSR § 47-30-5.8 ........................................................................34

WVCSR § 47-30-6.2.c ........................................................................8

WVCSR § 47-30-7 ........................................................................8

WVCSR § 47-30-8.2.c.2 ........................................................................9

**Other Authorities**

30 C.F.R. § 816.46(b)(2) ........................................................................4

40 C.F.R. § 25.10(b) ........................................................................49

40 C.F.R. §§ 122.41 to 122.44 ........................................................................41

40 C.F.R. §§ 122.44(d)(1)(v) to (vii) ........................................................................9

40 C.F.R. § 122.44(d)(vi) ........................................................................53

40 C.F.R. § 123.25(a)(2) ........................................................................11

40 C.F.R. § 130.7(d)(1) ........................................................................13

40 C.F.R. § 131.5(a) ........................................................................5

40 C.F.R. § 131.6(e) ........................................................................49

40 C.F.R. § 131.11(b) ........................................................................5

40 C.F.R. § 131.20(c) ........................................................................49

40 C.F.R. § 131.21 ........................................................................49

Comments Received, WV/NPDES Regulations for Coal Mining Facilities at 128 (Comments of Janet Keating, Exec. Dir. of OVEC) (Aug. 28, 2012), available at http://apps.sos.wv.gov/adlaw/csr /readfile.aspx?DocId=24131&Format=PDF (last accessed Mar. 31, 2016) ....................38

Comments Received, WV/NPDES Rule for Coal Mining Facilities at 5-10 (Comments of Appalachian Mountain Advocates) (Jul. 28, 2014), available at http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=26342&Format=PDF (last accessed Mar. 31, 2016). ....................40

Consolidated Permit Regulations, 45 Fed. Reg. 33,290 (May 19, 1980) ....................9, 10, 11, 31, 48

Fed. R. Civ. P. 50 ....................21, 22

H. Con. Res. 111, 79th Leg., 2d Reg. Sess. (W.Va. 2010) ....................14

*The Impacts of Mountaintop Removal Coal Mining on Water Quality in Appalachia: Hearing Before the Subcomm. on Water & Wildlife of the S. Comm. on Envt. & Public Works*, 111th Cong. 95 (2009) (statement of Randy Huffman, Cabinet Sec'y, WVDEP) ....................12, 13

Notice of Approval, 47 Fed. Reg. 22,363 (May 24, 1982) ....................4

Notice of Final Rule, WV/NPDES Rule for Coal Mining Facilities at 21 (Apr. 30, 2015), available at http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=26339&Format=PDF (last accessed Mar. 31, 2016) ....................40

Notice of Proposed Rulemaking, WV/NPDES Regulations for Coal Mining Facilities at 7, 27 (Jul 3, 2012), available at http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=23834&Format =PDF (last accessed Mar. 31, 2016). ....................38

NPDES; Revision of Regulations, 44 Fed. Reg. 32,854, (June 7, 1979) ....................46

S. Rep. No. 92-414 (1971), reprinted in 1972 U.S.C.C.A.N. 3675 ....................27, 51

W.Va.'s NPDES Program Transferring Authority Over Coal Mines and Coal Preparation Plants From the W.Va. Dep't of Natural Res. Div. of Water Res. to its Div. of Reclamation, 50 Fed. Reg. 28,202 (July 11, 1985). ....................42

W.Va.'s NPDES Program Transferring Authority Over Coal Mines and Coal Preparation Plants From the W.Va. Dep't of Natural Res. Div. of Water Res. to its Div. of Reclamation, 50 Fed. Reg. 2996 (Jan. 23, 1985)....................42

## JURISDICTIONAL STATEMENT

Ohio Valley Environmental Coalition, West Virginia Highlands Conservancy, and Sierra Club (collectively "OVEC") sued Fola Coal Company, LLC ("Fola") in the United States District Court for the Southern District of West Virginia under the citizen suit provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, and the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1270. OVEC asserted that the district court had subject matter jurisdiction pursuant to those statutes and 28 U.S.C. § 1331 (federal question). Joint Appendix ("JA") 27. The district court bifurcated the case into a liability phase and a relief phase. JA 41.

Fola appeals four orders of the district court. The first, entered on July 30, 2014, granted summary judgment to OVEC on jurisdiction (standing) and denied summary judgment to Fola on liability. JA 385-99. On September 30, 2014, after a trial on liability, the district court denied a motion for judgment on partial findings made by Fola during trial. JA 550-70. On January 27, 2015, the district court determined that OVEC had established at least one violation of Fola's permits. JA 571-612. Finally, on December 8, 2015, after a separate trial on relief issues, the district court ordered Fola to take certain remedial action. JA 1225-33.

Fola filed a timely notice of appeal on January 7, 2016. JA 1237. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the December 8, 2015 order

disposed of all parties' claims and ended the litigation on the merits. *Se. Bank, N.A. v. Carmazzi*, 910 F.2d 115, 117 (4th Cir. 1990). In the alternative, this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) because the December 8, 2015 order granted an injunction.[1]

## STATEMENT OF THE ISSUES

1. Whether the district court erred as a matter of law in ruling that West Virginia coal companies that hold National Pollutant Discharge Elimination System ("NPDES") permits, including Fola, can be subject to citizen suits under the CWA for discharging pollutants that cause a violation of water quality standards when those pollutants were disclosed in the permit application, within the reasonable contemplation of the permitting authority, and not expressly limited in the NPDES permits.

2. Whether the district court erred as a matter of law in adopting a standard for compliance with West Virginia's narrative water quality standards that has never been approved as a water quality standard by the State or the Environmental Protection Agency and is contrary to State law and policy as

[1] The Court has jurisdiction to review the orders entered on July 30, 2014, September 30, 2014, and January 27, 2015, because those decisions merged with the district court's December 8, 2015 final order granting injunctive relief. *Victor Talking Mach. Co. v. George*, 105 F.2d 697, 699 (3d Cir. 1939) ("All interlocutory orders and decrees from which no appeal has been taken are merged in the final decree."). *See also Glass v. Dachel*, 2 F.3d 733, 738 (7th Cir. 1993); *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1382 n. 7 (10th Cir. 1994).

expressed in West Virginia Department of Environmental Protection guidance and acts of the West Virginia Legislature.

3. Whether the Court erred as a matter of law in concluding that conductivity, though not itself a pollutant, is a reasonable and/or allowable surrogate for an unspecified mix of ionic pollutants in a CWA citizen suit.

4. Whether the district court erred as a matter of law by finding Fola liable for permit violations based on its discharges of conductivity when Fola had no prior knowledge, fair notice, or reason to believe that the permit would impose such liability.

## STATEMENT OF THE CASE

### A. Legal Background

#### 1. Surface Mining Control and Reclamation Act

All surface coal mines must be permited under SMCRA, 30 U.S.C. §§ 1201, *et seq*. Those permits restrict the manner in which land may be disturbed and mandate its remediation. *OVEC v. Aracoma Coal Co.*, 556 F.3d 177, 189-90 (4th Cir. 2009). The West Virginia Department of Environmental Protection ("WVDEP") has exclusive jurisdiction over the SMCRA program in West Virginia. *Id.* at 189. SMCRA authorizes surface mines in Appalachia to construct valley fills in small streams by placing in them excess spoil material disturbed to access underlying coal. *Id.* at 190; *Kentuckians for the Commonwealth v.*

*Rivenburgh*, 317 F.3d 425, 443 (4th Cir. 2003). SMCRA requires all water from mined areas, including valley fills, to be routed to water treatment ponds or ditches to control pollutants prior to discharge of that water. 30 C.F.R. § 816.46(b)(2). *See also* W. Va. Code R. (hereinafter "WVCSR") § 38-2-5.4.a. This case involves discharges from a pond constructed below a valley fill in Stillhouse Branch, a small tributary of Twentymile Creek of the Gauley River. JA 51.

**2. Clean Water Act**

Construction of valley fills and the discharge of stormwater runoff from the mined and fill areas implicate two permitting programs of the CWA, 33 U.S.C. §§ 1251, *et seq*. First, under CWA § 404, 33 U.S.C. § 1344, a mine operator must obtain a permit from the U.S. Army Corps of Engineers for the discharge of "fill material" into waters of the United States to build valley fills and in-stream ponds. *Aracoma*, 556 F.3d at 190-91 & 211-16. Second, and at the heart of this case, mine operators must obtain an NPDES permit under CWA § 402 for discharges of "non-fill" pollutants from discrete conveyances such as pond outlets or spillways known as "point sources." 33 U.S.C. §§ 1311(a) & 1342; *Aracoma*, 556 F.3d at 190. In West Virginia, WVDEP has administered a federally-approved NPDES program since 1982, which it implements through the State Water Pollution Control Act ("State WPCA") and NPDES rules. Notice of Approval, 47 Fed. Reg. 22,363 (May 24, 1982); W. Va. Code §§ 22-11-1 to -30; WVCSR §§ 47-30-1 to -15.

**a. Water Quality Standards: Numeric and Narrative**

Water quality standards are established by states under federal CWA guidelines and with EPA approval. 33 U.S.C. § 1313; 40 C.F.R. § 131.5(a). They establish the conditions that must be maintained in waters of the United States—they are the ultimate goal of the CWA. Most standards limit the numeric concentrations of particular pollutants in waterbodies to protect specific water "uses"—such as 1.5 milligrams per liter of iron to protect aquatic life. WVCSR § 47-2-8, Appendix E, Table 1. WVDEP has not adopted a water quality standard for conductivity, which the district court ordered Fola to reduce in its discharges. JA 1225. Nor has EPA ever proposed a recommended water quality standard for conductivity. *Sierra Club v. Patriot Mining Co., Inc.*, No. 13-0256, 2014 WL 2404299 at *4 n. 9 (W.Va. May 30, 2014) ("Neither the WVDEP nor the EPA has implemented regulations establishing numeric standards for …conductivity").

Water quality standards can also be expressed as narrative statements that describe conditions that are not allowed in waterbodies to maintain their uses. 40 C.F.R. § 131.11(b). At issue in this case are narrative water quality standards promulgated by WVDEP to protect aquatic life, which state in pertinent part:

> No sewage, industrial wastes or other wastes present in any of the waters of the state shall cause therein or materially contribute to any of the following conditions thereof:

> 3.2.e. Materials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life;
>
> 3.2.i. Any other condition…which adversely alters the integrity of the waters of the State including wetlands; no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed.

WVCSR §§ 47-2-3.2.e & 3.2.i.

### b. Effluent Limits

Although water quality standards pre-date the 1972 CWA, NPDES permits do not. *Piney Run Pres. Ass'n v. Co. Comm'rs of Carroll Co., Md.*, 268 F.3d 255, 264-65 (4th Cir. 2001). Congress first required NPDES permits with site-specific effluent limits in 1972. *EPA v. California*, 426 U.S. 200, 205 (1976). They represented a "fundamental change in the manner of federal regulation of water pollution" by shifting the focus from water quality standards to the calculation of precise effluent limits on discharges of pollutants. *Piney Run*, 268 F.3d at 265. *See also Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 809 F.Supp. 1040, 1045 (W.D.N.Y. 1992), *aff'd*, 12 F.3d 353 (2d Cir. 1993) ("The 1972 amendments to the [CWA] were an express acknowledgement that water quality standards had not proven effective in eliminating water pollution[.]").

Water quality standards are not self-implementing; they are goals to be protected by the imposition of "effluent limits" in NPDES permits. *Sierra Club v. ICG Hazard, LLC*, No. 11-148-GFVT, 2012 WL 4601012 at *12–14 (E.D. Ky.,

Sept. 28, 2012), *aff'd,* 781 F.3d 281 (6th Cir. 2015) (once permitting agency develops effluent limits, water quality standards lose their significance in any case against the permittee); *Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 350 (D.C. Cir. 1993) ("[W]ater quality standards themselves have no effect on pollution; the rubber hits the road when…state-created standards are used as the basis for specific effluent limitations in NPDES permits."); *Westvaco Corp. v. EPA*, 899 F.2d 1383, 1384 (4th Cir. 1990) ("Once water quality standards have been set, NPDES permit limitations are…established to assure compliance[.]").

WVDEP's NPDES permits impose effluent limits on the concentrations of pollutants allowed in the permittee's discharges. W. Va. Code § 22-11-8; WVCSR § 47-30-3. The effluent limits must reflect pollutant reductions using practicable technology available for the applicable industry ("technology-based effluent limits") and any more stringent limits needed to meet water quality standards ("water quality-based effluent limits"). WVCSR §§ 47-3-6.2.a & -6.2.c; *Piney Run*, 268 F.3d at 255.

The link between water quality standards adopted by rule and the effluent limits imposed in NPDES permits is forged by a detailed permit application and review process. *Piney Run*, 268 F.3d at 266 (permitting authority receives discharge information from applicants and calibrates individual permit limits to maintain water quality standards); *S. Appalachian Mountain Stewards v. A&G*

*Coal Corp.*, 758 F.3d 560, 563–65 (4th Cir. 2014). WVDEP's NPDES program requires permit applicants to submit data regarding the type and concentrations of pollutants in their expected discharges and in the waters that will receive those discharges. WVCSR § 47-30-4.5.b. Applicants must also submit information on the expected flows of their discharges and of the receiving streams. WVCSR § 47-30-4.5.a.9. WVDEP permit writers then carefully review this information to calculate outlet-specific effluent limits designed to ensure the concentrations of pollutants regulated by numeric water quality standards will not be exceeded downstream of a permitted discharge. WVCSR § 47-30-6.2.c. These water quality-based effluent limits vary by outlet depending on the flows and pollutant concentrations in the discharges and the capacity of the receiving stream to assimilate them. WVCSR § 47-30-7.

For narrative water quality standards, the process is not so straightforward, since narrative standards are ambiguous and not objectively measurable. *See, e.g.*, *OVEC v. Elk Run Coal Co., Inc.*, 24 F.Supp.3d 532, 545 (S.D.W.Va. 2014) (finding the operative phrases in WVCSR § 47-2-3.2.i —"significant adverse impact" and the "biological components of aquatic ecosystems"—to be ambiguous). EPA's NPDES permitting regulations set forth a detailed process by which a permitting authority can develop numeric effluent limits to protect

narrative water quality standards, if there is a sufficient scientific and technical basis to do so. 40 C.F.R. §§ 122.44(d)(1)(v) – (vii). *See infra* at 52-53.

Even after WVDEP issues an NPDES permit, the effluent limits in the permit may be changed. Permits are appealable to an administrative review board. W. Va. Code § 22-11-21. In addition, WVDEP must reevaluate and reissue permits every five years, at which time the permits can again be appealed. W. Va. Code § 22-11-11(c). Finally, WVDEP may modify permits when existing effluent limits are insufficient to meet water quality standards. WVCSR § 47-30-8.2.c.2. *See also* Consolidated Permit Regulations, 45 Fed. Reg. 33,290, 33,812 (May 19, 1980) ("permit may be modified…during its term for appropriate causes").

**c. CWA Citizen Suits and Permit Shield**

The CWA authorizes citizen suits against "any person…who is alleged to be in violation of…an effluent standard or limitation." 33 U.S.C. § 1365(a). For purposes of the citizen suit provision only, "effluent standard or limitation" is defined to include "an effluent limitation or other limitation under section 1311 or 1312" (technology and water quality-based effluent limits) and "a permit or condition thereof issued under section 1342" (NPDES permits issued pursuant to CWA § 402). 33 U.S.C. §§ 1365(f)(2) & (6). Section 1365 does not authorize citizen suits to enforce water quality standards, which are established pursuant to § 1313. 33 U.S.C. § 1365(f). *See also Atl. States Legal Found., Inc. v. Eastman*

*Kodak Co.*, 12 F.3d 353, 357-59 (2d Cir. 1993); *Oregon Nat. Res. Council v. U.S. Forest Service*, 834 F.2d 842, 850 (9th Cir. 1987); *State of N. Y. v. U.S.*, 620 F.Supp. 374, 384 (E.D.N.Y. 1985); *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 290-91 (6th Cir. 2015).

The CWA "shields" dischargers from liability in citizen suits and enforcement actions if they comply with their NPDES permits. Section 402(k) provides that:

> Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of section 1319 [§ 309: government enforcement actions] and 1365 [§ 505: citizen suits] of this title, with sections 1311 [§ 301: effluent limitations], 1312 [§ 302: water quality related effluent limitations], 1316, 1317, and 1343 of this title[.]

33 U.S.C. § 1342(k). The NPDES program thus burdens the applicant to disclose information about expected pollutant discharges, but thereafter burdens the agency to craft a permit with specific effluent limits sufficient to maintain water quality standards. 45 Fed. Reg. at 33,312 (permit shield "places burden on permit writers rather than permittees to search…applicable regulations and correctly apply them"). *See also ICG Hazard*, 2012 WL 4601012 at *8 (program not intended to limit every pollutant; restricts most harmful ones and otherwise relies on application disclosures).

If an applicant complies with application requirements, but the agency fails to restrict a discharged pollutant or miscalculates a limit, the permit is subject to administrative appeal, is re-opened every five years, and may be modified by the agency. But once the permit limits are finalized, the CWA does not contemplate direct enforcement action against the permittee except for violations of those express limits. The purpose of § 402(k) is "to relieve [permit holders] of having to litigate in an enforcement action the question whether their permits are sufficiently strict. In short, § 402(k) serves the purpose of giving permits finality." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n. 28 (1977). *See also A&G Coal,* 758 F.3d at 564. EPA recognizes the permit shield as "one of the central features of [its] attempt to provide permittees with maximum certainty during the fixed terms of their permits." 45 Fed. Reg. at 33,311. *See also* 40 C.F.R. § 123.25(a)(2) (requiring state NPDES programs to include permit shield provision). West Virginia's NPDES program has long contained a permit shield. W. Va. Code § 22-11-6(2); WVCSR § 47-30-3.4.a (compliance with permit constitutes compliance with CWA).

Courts, including this Court, have consistently held that the permit shield protects permittees from claims that they are violating the CWA by discharging pollutants not expressly identified and limited in their permits when the discharge of the pollutant giving rise to the enforcement action was within the reasonable

contemplation of the permitting authority at the time the permits were issued. *Piney Run*, 268 F.3d at 269; *ICG Hazard*, 281 F.3d at 285; *Eastman Kodak*, 809 F.Supp. at 1046 ("[I]t strains all credulity to propose that Congress…could have contemplated that a discharge by a permit holder of a pollutant *never even referenced in its permit* would form the basis of a permit violation cognizable under the [CWA's] citizen suit provision."), *aff'd*, 12 F.3d 353 (2d Cir. 1993). In *Piney Run*, this Court deferred to EPA policy concerning the scope of the protection the permit shield provides. 268 F.3d at 268 (NPDES permit holder may discharge pollutants not expressly limited in its permit if it complies with the CWA's reporting and disclosure requirements and permitting authority reasonably anticipates those pollutants will be discharged).

## B. Factual Background

### 1. West Virginia's Policies Regarding Narrative Water Quality Standards

In 2002, WVDEP began using the West Virginia Stream Condition Index ("WVSCI") to assess the health of the aquatic ecosystem in the State's waters. *The Impacts of Mountaintop Removal Coal Mining on Water Quality in Appalachia: Hearing Before the Subcomm. on Water & Wildlife of the S. Comm. on Envt. & Public Works*, 111th Cong. 95 (2009) (statement of Randy Huffman, Cabinet Sec'y, WVDEP) ("Huffman Testimony"). The WVSCI is an assessment tool that measures the types, numbers, and proportions of certain aquatic insects in a stream

and compares the measurements to those found in undisturbed "reference" streams. JA 249-50. It uses a scale from zero (0) to one hundred (100), with 100 representing the biological condition of reference streams. JA 270. A decreased WVSCI score indicates impacts on aquatic life, but provides no information about which pollutant(s) might be responsible for those impacts—or even whether the impacts are caused by a pollutant at all. JA 539-40, 731-32.

Pursuant to the CWA, States must compile a list of waters in which water quality standards are not being met and submit that list to EPA every two years. 33 U.S.C. § 1313(d); 40 C.F.R. § 130.7(d)(1). From 2002 to 2010, WVDEP listed streams with WVSCI scores below 60.6 as not meeting the narrative water quality standards at issue in this case.[2] Huffman Testimony at 95. Since 2009, however, both WVDEP and the State Legislature have rejected the use of a WVSCI score as a "stand alone determinant" of whether the narrative standards are being met. *Id.* ("Without evidence of any significant impact on the rest of the ecosystem beyond the diminished numbers of certain genus of mayflies, the State cannot say there has been a violation of its narrative standard.")

---

[2] At no point has WVDEP ever used the WVSCI to impose liability on a particular discharger, as the district court did here. Nor has the State ever subjected the WVSCI to rulemaking or adopted it as a water quality standard.

Subsequently, WVDEP examined the correlation between conductivity[3] and WVSCI scores. JA 1019-20. WVDEP found that conductivity levels over a broad range were a relatively poor predictor of WVSCI scores. JA 1019. Accordingly, WVDEP concluded that "it is infeasible to calculate a numeric effluent limit" for conductivity to maintain the narrative water quality standards. JA 1021. WVDEP also rejected the use of the WVSCI alone to assess compliance with the narrative standards, stating that it had determined that the phrase "significant adverse impact" as used in the narrative standards "is more than a change in the numbers or makeup of the benthic macroinvertebrate community in a segment of a water body downstream from a point source discharge." JA 1017. Thus, WVDEP concluded, "compliance with a standard that protects the aquatic ecosystem must be assessed in the broader area comprising the ecosystem. An ecosystem does not exist at a single point and, accordingly, health cannot be assessed at a single point." *Id.*

In 2010, the State Legislature declared that the narrative standards are met when there are sufficient aquatic insects to support fish, and that WVDEP is the entity responsible for interpreting and applying the narrative standards. H. Con. Res. 111, 79th Leg., 2d Reg. Sess. (W.Va. 2010). In 2012, the Legislature directed WVDEP to propose rules for measuring compliance with the narrative standards,

[3] Conductivity is a measure of a material's ability to conduct an electrical current, measured in microSiemens per centimeter (µS/cm). JA 750. It varies depending on the presence or absence of positively and/or negatively charged ions. *Id*. Elevated conductivity is evidence of elevated levels of dissolved salts or solids. *Id*.

stating that compliance must be tied to a determination that the aquatic community is "composed of benthic invertebrate assemblages sufficient to…support fish communities" and is not to be determined by reference to insect indices alone. S.B. 562, 80th Leg., 2d Reg. Sess. (W.Va. 2012) (now codified at W. Va. Code § 22-11-7b(f)). WVDEP has not yet completed that task.

### 2. OVEC's Efforts to Force WVDEP to Impose Effluent Limits on Conductivity

In 2010, OVEC pursued an administrative appeal of an NPDES permit issued by WVDEP for a surface mine. *Sierra Club v. Patriot Mining Co., Inc.*, No. 13-0256, 2014 WL 2404299 at *2 (W.Va. May 30, 2014). OVEC challenged the absence of conductivity limits in the permit, arguing they were necessary to protect the narrative water quality standards. *Id.* OVEC relied on an EPA guidance memorandum that suggested permitting authorities in Appalachian states should adhere to a new EPA "benchmark," which "recommends that water conductivity levels not exceed 300-500 microsiemens per centimeter" to protect aquatic life.[4] *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 248 (D.C. Cir. 2014); *Patriot Mining* at *1 n. 3. The West Virginia Supreme Court upheld WVDEP's permit and endorsed the agency's decision not to impose an effluent limit on conductivity.

[4] EPA's guidance memorandum was based on a scientific report developed by EPA entitled "A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams." JA 734-1010 ("EPA Benchmark"). *See also Nat'l Mining Ass'n v. Jackson*, 880 F.Supp.2d 119, 130 & 138-39 (D.D.C. 2012), *rev'd sub nom, Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014).

*Patriot Mining* at *5-6. The court concluded that it was "not persuaded by the evidence of record that there is adequate agreement in the scientific community" regarding the relationship between conductivity and the narrative standards. *Id.* at *5.

Having lost its permit challenge, OVEC resorted to citizen suits like this one. OVEC has filed five such suits against Fola involving twelve pond outlets.[5] In these suits, OVEC relies on the EPA Benchmark to convince the district court to require Fola and other mining companies to reduce the level of conductivity in their discharges to 300 µS/cm. *See, e.g.*, JA 590 ("The Court finds that EPA's Benchmark supports Plaintiffs' theory of causation."); *OVEC v. Elk Run Coal Co., Inc.*, 24 F.Supp.3d 532, 556-560 (S.D.W.Va. 2014) (discussing EPA Benchmark). Yet EPA itself has insisted that its guidance regarding the EPA Benchmark "does not tell regulated parties what they must do or may not do in order to avoid liability," that it "imposes no obligations or prohibitions on regulated entities," and that it "may not be the basis for an enforcement action against a regulated entity[.]" *Nat'l Mining Ass'n*, 758 F.3d at 252.

[5] All of the suits against Fola were filed in the U.S. District Court for the Southern District of West Virginia. *See* Case Nos. 2:10-cv-1199, 2:13-cv-5006, 2:13-cv-16044, 2:13-cv-21588, and 2:15-cv-1371.

### 3. Fola's NPDES Permit

Fola first obtained NPDES Permit No. WV1014005 ("NPDES Permit" or "Permit") for its Surface Mine No. 3 in June 1996. JA 152. WVDEP reissued the Permit several times thereafter, including in 2009. JA 1243. The 2009 Permit was the one in effect at the time Plaintiffs' filed their Complaint in this action in 2013. The Permit regulates discharges from sixteen outlets, including Outlet 029, a pond outlet that discharges into Stillhouse Branch, a tributary of Twentymile Creek. JA 1249. Fola's § 404 permit authorized it to fill most of Stillhouse Branch; after mining, approximately six hundred feet of the stream remained downstream of Outlet 029. JA 51, 1226.

Fola's 2009 application for reissuance of the Permit included analyses for conductivity in ranges similar to those OVEC alleges are causing violations of Fola's Permit. JA 575. WVDEP conducted a detailed review of the application, prepared a draft permit and a "rationale page" explaining that it was imposing water quality-based limits at Outlet 029, and included a worksheet showing the calculations performed to derive those limits. JA 1286-91.

The draft permit was then subject to public notice and comment, and WVDEP reissued the permit on September 8, 2009. JA 3, 1293-97, 1304, 1308-09. As noted by the district court, even though the application disclosed conductivity levels similar to those OVEC alleges caused a violation of Fola's Permit,



4811-7005-5216.v2

"WVDEP elected not to limit the concentration of conductivity…that Fola may discharge[.]" JA 575. Accordingly, the Permit did not contain effluent limits on conductivity at Outlet 029 (or at any other outlet). JA 575, 1245-52. OVEC neither submitted comments to WVDEP during the public comment period, nor challenged the Permit once it was issued.

All NPDES permits issued by WVDEP for surface mine discharges, including Fola's Permit, contain four main sections. Section A is entitled "Discharge Limitations and Monitoring Requirements." JA 1244. It sets forth the specific pollutants that are restricted at each outlet, the level at which those pollutants are restricted, and the frequency with which the permittee must monitor its discharges for those pollutants and report that data to WVDEP. JA 1244-55. Section B sets forth a "Schedule of Compliance" by which permittees must meet the discharge limitations in Section A. JA 1256. Section C contains a boilerplate cross-reference to nineteen rules (with over eighty subparts) applicable to coal NPDES permits. JA 1257. Section D sets forth "Other Requirements," including monitoring requirements at specified locations in the streams that receive discharges from the permittee's outlets. JA 1258-59. Section D also contains a "reopener clause," which provides that "[b]ased upon the stream monitoring…data…or other information," WVDEP "may at any time modify the

effluent limits in Section A…if necessary, to insure compliance with water quality standards." JA 1258.

The permit provision at issue in this case is found in Section C. JA 1257. One of the nineteen rules cross-referenced in that section is WVCSR § 47-30-5.1, which is identified by its heading, but not set forth in full in the Permit. At the time OVEC filed suit against Fola, one of the seven subparts to that rule, WVCSR § 47-30-5.1.f (referred to hereinafter as Rule 5.1.f), stated:

> The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47 C.S.R. 2. Further, any activities covered under a WV/NPDES permit shall not lead to pollution of the groundwater of the State as a result of the disposal or discharge of such wastes covered herein. However, as provided by subdivision 3.4.a. of this rule, except for any toxic effluent standards and prohibitions imposed under CWA Section 307 for toxic pollutants injurious to human health, compliance with a permit during its term constitutes compliance for purposes of enforcement with CWA Sections 301, 302, 306, 307, 318, 403, and 405 and Article 11.

WVCSR § 47-30-5.1.f (2010) (emphasis added).[6] The district court concluded that the underlined sentence unambiguously prohibits Fola from discharging any pollutant at a level that causes a violation of any of the hundreds of numeric or narrative water quality standards established by WVDEP, just as it prohibits

[6] Rule 5.1.f has since been amended to remove the underlined sentence. *See infra* at 40 n. 10.

discharges in excess of the discharge restrictions specified in Section A of the Permit. JA 387-89, 577.

### C. Procedural Background

OVEC filed this suit against Fola on March 13, 2013. JA 26. Its Complaint relied on the citizen suit provisions of the CWA and SMCRA. JA 27. The Complaint alleged that Fola's discharges from Outlet 029 contain levels of conductivity high enough to cause violations of the narrative water quality standards in Stillhouse Branch. JA 35-36. OVEC alleged that these discharges violated Fola's Permit because the reference to Rule 5.1.f in the Permit prohibits Fola from discharging pollutants in violation of water quality standards. JA 36. While the citizen suit provision does not authorize citizen suits for violations of water quality standards, OVEC argued that Rule 5.1.f makes all of West Virginia's water quality standards enforceable "effluent standard[s] or limitation[s]" as defined in CWA § 505(f)(6). 33 U.S.C. § 1365(f)(6) ("a permit or condition thereof").

The district court bifurcated the case into a liability phase and a remedy phase. JA 41. OVEC moved for partial summary judgment on the issue of standing. JA 45. Fola opposed OVEC's motion and filed a cross-motion for summary judgment on the merits of the case. JA 48-49. Fola argued, among other things, that it was protected from liability by the CWA's permit shield and that

OVEC had relied on an unlawful rule (WVSCI) to define compliance with narrative water quality standards. JA 49, 388-89.

The district court granted OVEC's motion for partial summary judgment as to standing. JA 385. It denied Fola's motion for summary judgment by simply referencing its earlier-issued opinion in a similar case, *OVEC v. Elk Run Coal Co., Inc.*, 24 F. Supp. 3d 532 (S.D.W.Va. 2014), which in turn cited *OVEC v. Elk Run Coal Co., Inc.*, No. 3:12-cv-0785, 2014 WL 29562 at *3 (S.D.W.Va. Jan. 3, 2014), which cited *OVEC v. Marfork Coal Co., Inc.*, 966 F.Supp.2d 667, 676-86 (S.D.W.Va. 2013) and *OVEC v. Fola Coal Co., LLC*, No. 2:12-cv-3750, 2013 WL 6709957 at *10-20 (S.D.W.Va. Dec. 19, 2013).[7] JA 389. In its order denying Fola's motion for summary judgment, the district court did not expressly grant summary judgment to OVEC, but it noted in a subsequent order that it had earlier decided those legal issues on the merits in OVEC's favor, and the issues were not addressed at all during the subsequent trial. JA 575 (noting Fola's arguments regarding the CWA's permit shield and WVSCI had been "already defeated" and were "settled questions of law").

The court conducted a four-day bench trial on liability in August 2014 after denying Fola's request for a jury trial. JA 236-38, 383-84. At the conclusion of OVEC's case in chief, Fola moved for judgment on partial findings under Fed. R.

---

[7] The latter two cases involved discharges of selenium, not conductivity, but OVEC's claims were based on the same permit provision referencing Rule 5.1.f.

Civ. P. 50, arguing that OVEC had failed to prove that conductivity is a "pollutant" that is causally linked to a violation of the narrative water quality standards and subject to a CWA citizen suit. JA 550, 554-55. The court deferred ruling on Fola's motion until after trial. JA 550.

In September 2014, the court denied Fola's Rule 50 motion, ruling that OVEC need not prove that a particular pollutant caused violations of the narrative standards so long as the ionic mixture of Fola's discharges was sufficiently like other mixtures associated with adverse effects. JA 569-70. In January 2015, the district court found that Fola had "committed at least one violation of its permits by discharging high levels of ionic pollution, as measured by conductivity, into Stillhouse Branch, which have caused or materially contributed to a significant adverse impact to the chemical and biological components of the applicable stream's aquatic ecosystem, in violation of the narrative water quality standards incorporated into those permits." JA 571. The district court did not expressly rule on OVEC's SMCRA claim.

Fola filed a motion to certify the district court's July 30, 2014, September 30, 2014, and January 27, 2015 orders for immediate appeal to this Court, which the district court denied. JA 613, 622. The district court held a bench trial on remedy issues in October 2015. JA 1024. OVEC urged the district court to order Fola to construct and implement a reverse osmosis treatment system, which

decreases conductivity by using finely porous membranes to restrict the movement of ions. JA 1030-31, 1227. The district court determined that injunctive relief was appropriate by an order entered October 14, 2015, but reserved judgment as to the specific remedy. JA 1024.

The district court granted injunctive relief on December 8, 2015, requiring Fola to "implement such measures as are necessary to reduce the level of conductivity in Stillhouse Branch to 300 microsiemens per centimeter (300 µS/cm) or less or to achieve passing WVSCI scores in Stillhouse Branch." JA 1225. However, the district court rejected the use of reverse osmosis treatment because its costs are unreasonable and OVEC's own expert testimony "revealed many reasons to doubt [its] feasibility" at this location. JA 1228-29. The district court appointed a special master to oversee implementation of the relief ordered. JA 1234-36. Fola appealed on January 7, 2016. JA 1237. OVEC cross-appealed on January 21, 2016. JA 1239.

## **SUMMARY OF THE ARGUMENT**

This case presents issues familiar to this Court. In *Piney Run*, this Court examined and explained how the CWA regulates discharges into the Nation's rivers and streams. 268 F.3d 255 (4th Cir. 2001). The Court's opinion has been cited frequently by other courts examining the issue.

As explained by this Court, the regulation of water pollution was very complicated prior to the enactment of the CWA. States set water quality standards to protect their waters and "[o]perators could discharge pollutants so long as their discharges did not reduce water quality below these standards." *Id*. at 264. This scheme, however, "was plagued with many problems." *Id*. "Significantly, it was often difficult to formulate precise water quality standards and even more difficult to prove that a particular operator's discharge reduced water quality below these standards." *Id*.

To rectify this, Congress passed the CWA in 1972. "It represented a fundamental change in the manner of federal regulation of water pollution." *Id*. at 265. The CWA "shifted the focus away from water quality standards to direct limitations on the discharge of pollutants." *Id*. (citing *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 151 (4th Cir. 2000)). Under the CWA, "[r]egulators no longer had to determine whether there was a causal link between the degradation of water quality and the pollutant in question; they simply had to determine whether the entity was discharging more pollutant into water than allowed by" its NPDES permit. *Id*. at 265. Dischargers no longer had to guess whether they were complying with water quality standards, because "the permitting authority must, with reference to what is technologically feasible, incorporate 'discharge limitations necessary to satisfy the [state water quality]

standard[s].'" *Id*. at 266. As long as permit holders "follow the terms of their NPDES permits," they "avoid CWA liability." *Id*. at 265.

More than forty years later, the district court determined that West Virginia never made the "fundamental change" made by the rest of the Nation. It found that permit holders can still be held liable if their discharges are causally linked to violations of water quality standards—even where those permit holders are complying with their express permit limits. To reach this conclusion, the district court violated established rules of permit construction laid out by this Court in *Piney Run*. In particular, the district court focused on an isolated and ambiguous provision in Fola's permit to the exclusion of other clear permit provisions. Similarly, it ignored numerous statements by West Virginia explaining that its NPDES permitting system was intended to work just like those in the rest of the Nation.

Predictably, the district court's ruling resurrected the very problems Congress sought to cure when it "shifted the focus away from water quality standards." *Id*. Once the district court determined that Fola could be held liable for violating water quality standards, it endeavored to determine whether a violation had actually occurred. But, as this Court recognized in *Piney Run*, it is "difficult to formulate precise water quality standards and even more difficult to prove that a

particular operator's discharge reduced water quality below these standards." *Id*. at 264. The district court made these difficulties quite clear.

OVEC claimed that discharges of conductivity by Fola violated West Virginia's narrative standards. Not surprisingly, the district court found these standards to be ambiguous. So, the district court created its own standard. It determined that Fola would be held liable if it caused streams to receive a failing score under the WVSCI. This ruling ignored the fact that water quality standards must be created by States and approved by EPA. Neither step had occurred with respect to the WVSCI. Indeed, West Virginia had *expressly rejected* WVSCI as a proper tool for measuring compliance with its narrative standards.

Nevertheless, after deciding to use WVSCI, the district court had to determine whether Fola's discharges of conductivity were causally linked to failing WVSCI scores. This proved difficult as well. The district court learned that conductivity is not even a "pollutant," and that West Virginia had expressly elected not to limit conductivity after determining it is poorly correlated with WVSCI scores. After a four-day trial with multiple expert witnesses holding doctoral degrees, the district court determined that conductivity was an adequate surrogate for the unspecified pollutants in Fola's discharges, and that new scientific publications using novel theories of causation showed a causal link between Fola's discharges of conductivity and reduced WVSCI scores in Stillhouse Branch.

Such a process was exactly what Congress sought to avoid when it passed the CWA. Congress recognized that it is difficult to establish "a causal link between the degradation of water quality and the pollutant in question." 268 F.3d at 265. Accordingly, Congress provided that citizen suits would be based on "an objective evidentiary standard" and not a "court-developed definition of water quality." S. Rep. No. 92-414 (1971), reprinted in 1972 U.S.C.C.A.N. 3675, 3745. Here, though, the district court set its *own* water quality standard and held a complicated trial where experts sparred over whether conductivity levels in Fola's discharges were linked to violations of that standard. Fola did not learn that it was in violation until five months later, when it received the district court's opinion.

Such a process was not merely unintended by Congress. It was also unfair. Fola applied for its NPDES permit in 2009. It fully disclosed all of the constituents in its discharges, including conductivity. WVDEP, in its expert judgment as the permitting authority, decided not to impose conductivity limits in Fola's Permit. The district court relied on scientific publications released *after Fola's Permit was issued* and held Fola liable for violating water quality standards. It is difficult to imagine what more Fola could have done to comply with the law.

The district court's decision should be reversed and the NPDES permitting system that Congress intended—and which West Virginia desires—should be reinstated in West Virginia.

## ARGUMENT

### STANDARD OF REVIEW

The interpretation of an NPDES permit is a question of law. *Piney Run*, 268 F.3d at 269. Courts interpret permits in the same manner as contracts or other legal documents. *Id.* In reviewing a district court's interpretation of an NPDES permit, this Court reviews the district court's application of contract principles and its conclusion as to whether the permit is ambiguous *de novo*. *Id.*

### I. THE DISTRICT COURT ERRED BY DETERMINING THAT FOLA WAS SUBJECT TO CWA LIABILITY

This case is controlled largely by this Court's decision in *Piney Run*. There, the Court was asked to determine whether an NPDES permit holder was shielded from liability for discharges of heat when the permit did not contain express effluent limits for heat. 268 F.3d at 260-61. The Court deferred to EPA's interpretation of the scope of the permit shield as expressed in a policy memo, and found that permit holders are shielded for discharges of any pollutants disclosed to the permitting agency during the permitting process. *Id.* at 269.

The permit holder in *Piney Run* had disclosed discharges of heat to the permitting agency. *Id.* at 271. However, before the Court could find that the permit holder was shielded from liability, it had to interpret a footnote in the permit providing that "discharges of pollutants not shown shall be illegal." *Id.* at 269. The Court found that a "plain application of the footnote" would make the discharge of

heat illegal because heat was "not shown" in the permit. *Id*. However, the Court recognized that the footnote had another possible meaning: that pollutants "not shown" to the permitting agency in the permit application shall be illegal. *Id*. at 269-70. Because the footnote was capable of multiple interpretations, the Court found it was ambiguous and turned to extrinsic evidence "to determine the intent of the permitting agency in drafting this footnote." *Id*. at 270. After examining the extrinsic evidence, this Court determined that the permit did not specifically limit the discharge of heat, so the permit holder was indeed shielded from liability. *Id*. at 270-71.

Here, the district court failed to undertake a similar analysis with respect to Fola's discharges of conductivity. While the Court in *Piney Run* "carefully examined the footnote" and found ambiguity, the district court quickly concluded that a rule referenced in Fola's permit clearly required Fola to limit discharges of conductivity. JA 386 ("This is an enforceable permit condition." (citing *Elk Run*, No. 3:12-cv-0785, 2014 WL 29562 at *3, 6)); *Marfork*, 966 F.Supp.2d at 682. However, like the footnote in the permit in *Piney Run*, the permit condition relied upon by the district court is subject to multiple interpretations. Under *Piney Run*, the district court should have looked to extrinsic evidence to determine the correct interpretation, but it labored instead to ignore such evidence. As explained below,

the extrinsic evidence demonstrates that Fola should be shielded from CWA liability.

### A. Like the Permit in *Piney Run*, Fola's Permit Contains a Provision Subject to Multiple Interpretations

Section C of Fola's Permit references a list of nineteen NPDES rules containing more than eighty subparts. JA 1257. The district court focused its attention on one of those subparts: Rule 5.1.f. When Fola's Permit was reissued in 2009, a sentence in that rule provided that "[t]he discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards." WVCSR § 47-30-5.1.f (2010). To the district court, the meaning of this sentence was obvious—"if a permit holder does cause a violation of …water quality standards…, then the permit holder has violated the terms of its permit." *Marfork,* 966 F.Supp.2d at 682-83.

The meaning of Rule 5.1.f, however, is not so obvious. Contrary to the district court's conclusion, the language of the rule does not expressly command a permit holder to meet water quality standards. Indeed, the rule does not mention the permit holder at all. Instead, it focuses on the "discharges" authorized by "a WV/NPDES permit," which are required to be "of such quality" as to avoid violations of water quality standards. The rule does not specify how this requirement is to be achieved or by whom.

Without any analysis, the district court simply assumed Rule 5.1.f placed a duty on the permit holder to ensure that its discharges comply with water quality standards. But an alternative, and better, interpretation is that the rule makes it clear that WVDEP must craft permits that ensure that discharges meet water quality standards. This interpretation better fits the traditional roles of permit holder and permit writer. As EPA has noted, it is the responsibility of the permitting authority to understand its regulations and draft permits that comply with them, not the burden of permittees "to search…applicable regulations and correctly apply them." 45 Fed. Reg. at 33,312.

Such an interpretation also gives life to the entire Permit. Section A of Fola's Permit, entitled "Discharge Limitations and Monitoring Requirements," states that the permit holder "is authorized to discharge…as specified below" and that "[o]utlets should be limited and monitored…as specified below." JA 1244-52. That section then spells out each pollutant that is limited, the levels at which those pollutants are limited, and the frequency and method of monitoring that is required for each pollutant that is limited. JA 1249 (discharge limitations for Outlet 029). Section A also requires Fola to report to WVDEP "the number of analyzed samples that exceed the allowable permit conditions." JA 1253. Yet Fola is only required to monitor and report the pollutants listed in Section A. There is no indication at all in

Section A that there are other conditions in the Permit that impose additional restrictions on Fola's discharges.

Section D of the Permit works in concert with Section A. It expressly recognizes that when existing effluent limits do not maintain water quality standards, then the proper response is to modify the effluent limits:

> Based upon the stream monitoring flow data, water quality standards or other information, [WVDEP] may at any time modify the effluent limits in Section A of this permit for any of the discharge points if necessary, to insure compliance with water quality standards.

JA 1258. Together, Sections A and D of the Permit ensure that the permit is written—and modified as necessary—to meet water quality standards. Fola's reading of Section C is entirely consistent with this.

By contrast, the district court's reading of Section C renders Sections A and D superfluous. Under the district court's interpretation, Section C's reference to Rule 5.1.f means that permit holders are required to limit every conceivable pollutant in a manner that maintains water quality standards. If correct, there would be no reason to limit particular pollutants in Section A or to revise those limits pursuant to Section D in order to meet water quality standards. Instead, the permit could consist of a single command: meet all water quality standards.

The district court's construction of the Permit violates basic rules of interpretation. Each condition in an NPDES permit must be examined in light of

other permit conditions and "the structure of the permit as a whole." *Natural Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d 1194, 1204-05 (9th Cir. 2013) (citing *Piney Run*, 268 F.3d at 270). Indeed, at least one court has refused to find that a permit required compliance with water quality standards where the permit contained a provision—like the one in Section D of Fola's Permit—authorizing modification of effluent limits if necessary to maintain water quality standards. *Altamaha Riverkeeper Inc. v. Rayonier, Inc.*, No. CV 214-44, 2015 WL 1505971 at *6 (S.D.Ga. Mar. 31, 2015) ("This provision means nothing if it does not contemplate the possibility that the Permit's conditions do not, in fact, incorporate all of Georgia's water quality standards as conditions of the permit.").

The district court's interpretation of the Permit also ignores the particular language of Rule 5.1.f. Many of the rules referenced in Section C of the Permit expressly command compliance by the permittee. There are rules providing that the "permittee must comply" with permit conditions; the "permittee shall comply" with effluent standards for toxic pollutants; the "permittee must apply for reissuance of the permit;" and the "permittee shall at all times operate and maintain all facilities and systems of treatment and control." *See* WVCSR §§ 47-30-5.1.a, -5.1.b, -5.2, -5.5. By contrast, Rule 5.1.f does not command the permittee to do anything. Using the passive voice, the rule simply states that "discharges…covered by a…permit are to be of such a quality so as not to cause violation of applicable

water quality standards." In this sense, it is like other cross-referenced rules that explain, in the passive voice, how the permit operates. *See, e.g.*, WVCSR §§ 47-30-5.6 (the "permit may be modified, reissued, suspended, or revoked for cause"); -5.7 (the "permit is not transferable to any person except after notice to the Secretary"); and -5.8 (the "permit does not convey any property rights").

In summary, Fola's Permit can be interpreted in two ways: it either commands Fola to meet water quality standards or it requires the Permit to be crafted by WVDEP to ensure that water quality standards are met. The latter interpretation is the more reasonable one: it gives life to all parts of the Permit and is based on a careful examination of the language used by WVDEP, in accordance with this Court's ruling in *Piney Run*. When this Court concluded that there were two "entirely reasonable readings of the footnote" at issue in that case, it concluded that it should "turn to extrinsic evidence to determine the intent of the permitting authority[.]" 268 F.3d at 270. As explained below, the extrinsic evidence in this case is illuminating.

### B. Extrinsic Evidence Demonstrates That West Virginia Intended To Shield Permittees Like Fola

West Virginia has repeatedly made it clear that permittees like Fola are shielded from CWA liability if they comply with the express effluent limits in their NPDES permits. There is no evidence that West Virginia ever intended a contrary result.

### 1. Guidance From WVDEP

In 2012 and 2013, WVDEP explained the scope of the permit shield in official correspondence. As demonstrated below, these letters are illuminating. Under *Piney Run*, the district court should have used them as "extrinsic evidence to determine the intent of the permitting authority." 268 F.3d at 270. But the district court did just the opposite. It interpreted Rule 5.1.f first and then dismissed WVDEP's statements as inconsistent with that interpretation.

In March 2012, OVEC's counsel requested that WVDEP take enforcement action against Fola at two of its surface mines for violating the State's numeric water quality standards for selenium, a pollutant that was not specifically limited by Fola's NPDES permits for those mines. JA 93. WVDEP responded in June 2012 with a letter explaining that although Fola's discharges did contain elevated levels of selenium, Fola was in compliance with its NPDES permits, because the State's permit shield provision "has the effect of preventing the State from taking enforcement action against a permit holder for water quality standards that are not embodied in effluent limitations that are expressed in a NPDES permit." JA 88-89 (emphasis added). WVDEP further explained that under such circumstances, it would issue an administrative order requiring Fola either to demonstrate that its discharges were not causing violations of water quality standards in the receiving

streams or to apply for a permit modification to add effluent limits on selenium. JA 89.[8]

This letter provided clear evidence of WVDEP's interpretation of its NPDES permitting program. But the district court rejected it. It first found that Rule 5.1.f commands permit holders to meet water quality standards. *Marfork*, 966 F.Supp.2d at 679. Working backward, it then dismissed WVDEP's position as "unreasonable" because it would "eliminate" that "important permit condition." *Id*. at 681.

The district court also found that WVDEP's interpretation was "contrary" to the position it took in an August 2012 letter to EPA and a June 2013 letter to Fola's counsel. At OVEC's urging, the district court found that those letters merely acknowledge that the State permit shield is "co-extensive" with the federal permit shield, which requires compliance with all permit conditions. *Id*. at 680. But, according to the district court, these letters "ignore[d] the fundamental question: does § 47-30-5.1.f, as a permit condition, require permit holders not to cause a violation of water quality standards, even for pollutants that are not embodied in specific effluent limitations?" *Id*.

---

[8] WVDEP did issue such an order to Fola, and Fola's NPDES permits were subsequently modified to include effluent limits on selenium. JA 90-92; *OVEC v. Fola Coal Co., LLC*, No. 2:13-cv-3750, 2014 WL 5444392 at *3-4 (S.D.W.Va. Oct. 23, 2014).

In fact, though, WVDEP directly answered the district court's "fundamental question" in the very same June 2013 letter from which the district court quoted. Specifically, Fola's counsel asked WVDEP whether West Virginia law:

> shields from liability a permittee which is meeting its express numeric effluent limits <u>whether or not that permittee is complying with rules or conditions requiring compliance with water quality standards</u>?

JA 86 (emphasis added). WVDEP responded as follows:

> The answer to your first question is yes[.] […] [W]hen a permittee is meeting the express numeric limits in its permit, the permittee is shielded from liability for the discharge of pollutants not expressly mentioned in the permit[.]

JA 70. The district court inexplicably ignored this portion of the letter.

Likewise, the district court also ignored another June 2013 letter from WVDEP to EPA. There, WVDEP stated that a bill passed by the State Legislature in 2012 (discussed below) "was intended to conform West Virginia law to federal law." JA 83. WVDEP went on to quote from *Piney Run* and the EPA policy memo this Court deferred to in that case, which both state that a permit holder who complies with disclosure requirements during the permitting process is shielded for discharges of pollutants not specifically identified in its permit. JA 83-85. WVDEP stated that it "fully agrees with this interpretation." JA 84.

When WVDEP stated that West Virginia's permit shield is "co-extensive" with federal law, it was not simply acknowledging that in order to be shielded,

permittees must comply with all permit conditions. Instead, WVDEP was making it clear that dischargers in West Virginia are shielded from liability for pollutants not expressly limited in their permits, just as this Court held in *Piney Run*. WVDEP does not interpret Rule 5.1.f in the same manner as the district court, and it is difficult to understand how the district court concluded otherwise.

### 2. Clarifications by the Legislature and WVDEP

The district court also disregarded actions taken by West Virginia to clarify the law. In 2012 and 2013, the Legislature and WVDEP clarified that the permit shield prevents the enforcement of water quality standards not reduced to numeric effluent limits. In 2012, the Legislature amended the State WPCA with the avowed goal of "clarifying that compliance with the effluent limits contained in a NPDES Permit is deemed compliant with West Virginia's [WPCA]." JA 66.

In 2013, WVDEP followed by amending its rules to include express permit shield language within Rule 5.1.f. *See* Notice of Proposed Rulemaking, WV/NPDES Regulations for Coal Mining Facilities at 7, 27 (Jul 3, 2012), available at http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=23834&Format=PDF (last accessed Mar. 31, 2016). Tellingly, OVEC opposed this change, stating in a public comment that under the amended rule, coal mines would "be exempt from meeting [water quality] standards[.]" *See* Comments Received, WV/NPDES Regulations for Coal Mining Facilities at 128 (Comments of Janet Keating, Exec.

Dir. of OVEC) (Aug. 28, 2012), available at http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=24131&Format=PDF (last accessed Mar. 31, 2016). The district court, however, concluded that the regulatory and statutory amendments were ambiguous and served only to "clarify" that a permittee is shielded if it complies with "all conditions of its permit," including the district court's "condition" that a permittee comply with water quality standards.[9] *Marfork*, 966 F.Supp.2d at 681.

The district court's reading of these statutory and regulatory amendments is untenable. Nothing in the amendments suggested that West Virginia—after years of consistently shielding permittees who meet effluent limits—wanted to "clarify" that such permittees could still be held liable for violating permit conditions. Indeed, the Legislature's amendment expressly shielded compliant permittees

[9] Specifically, the district court concluded that the Legislature amended the statute to clarify that permittees must comply with "effluent limits," which the district court found included "a permit or condition thereof." *Marfork* at 681. However, the district court confused the term "effluent standard or limitation," as used in the citizen suit provision of the CWA, with the term "effluent limitation," as used in the entire CWA. The former term is used to describe the types of violations that may form the basis of a citizen suit, and includes "a permit or condition thereof." *See* 33 U.S.C. §1365(f). This is the definition the district court cited. But the term "effluent limit" or "effluent limitation," as used in the entire CWA, refers to restrictions on discharges, such as those found in Section A of Fola's Permit. 33 U.S.C. § 1362(11). The State WPCA contains an almost identical definition of "effluent limitation." W. Va. Code § 22-11-3(8). Accordingly, when the Legislature sought to shield permittees who were meeting "effluent limits," it was not referring to all permit conditions, it was referring to the discharge limitations found in Section A of NPDES permits issued by WVDEP.

"notwithstanding any rule or permit condition to the contrary." JA 67. Plainly, this language does nothing to compel compliance with permit conditions, as the district court found.

The district court strained to ignore the language of the amendments and to read them out of context. West Virginia amended its laws following a barrage of suits by OVEC against permittees who were meeting effluent limits. Everyone, including OVEC, understood that the amendments were intended to clarify that such permittees were shielded from suit. The district court labored to ignore that reality.[10]

### 3. Contemplation of the Parties

In *Piney Run*, this Court also considered whether the parties actually contemplated that the permit would "impose liability…for the discharge of a fully

---

[10] Subsequent to the district court's ruling, West Virginia made its intent unmistakably clear. In 2015, the State amended Rule 5.1.f to delete the disputed language regarding water quality standards. Notice of Final Rule, WV/NPDES Rule for Coal Mining Facilities at 21 (Apr. 30, 2015), available at http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=26339&Format=PDF (last accessed Mar. 31, 2016). Further, the Legislature amended the State WPCA to provide that "water quality standards themselves shall not be considered 'effluent standards or limitations'" and "shall not be incorporated wholesale either expressly or by reference as effluent standards or limitations in a permit[.]" W. Va. Code §§ 22-11-6(2) & -8(a). Those amendments are awaiting EPA review. OVEC and its counsel submitted comments opposing the change to Rule 5.1.f, arguing the new rule would destroy its ability to bring suits such as this one to enforce water quality standards. Comments Received, WV/NPDES Rule for Coal Mining Facilities at 5-10 (Comments of Appalachian Mountain Advocates) (Jul. 28, 2014), available at http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=26342&Format=PDF (last accessed Mar. 31, 2016).

disclosed but unlisted pollutant." 268 F.3d at 271. The Court found that if such liability had been intended by a footnote in the permit, it would have expected "an extended discussion of the consequences of such a decision." *Id*. However, because there was no evidence that the parties ever "discussed this footnote, its provisions, its possible ramifications, or its possible interpretation during the permitting process," the Court declined to find that the footnote imposed liability on the permittee. *Id*. A similar result is warranted here.

While permittees must meet effluent limits, there is no requirement in the CWA that permittees meet water quality standards. EPA sets forth the conditions that must be included in every NPDES permit. 40 C.F.R. §§ 122.41 to 122.44. Those rules require permits to include effluent limits that are protective of water quality standards, but nowhere does EPA require permits to contain a condition requiring the permit holder to meet water quality standards. Consistent with this, courts have routinely held that water quality standards are not enforceable in a CWA suit. *Eastman Kodak*, 12 F.3d at 357-59; *Oregon Nat. Res. Council v. U.S. Forest Service*, 834 F.2d 842, 850 (9th Cir. 1987); *State of N. Y. v. U.S.*, 620 F.Supp. 374, 384 (E.D.N.Y. 1985); *ICG Hazard, LLC*, 781 F.3d at 290-91.[11]

---

[11] The Ninth Circuit reached a contrary conclusion in *Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 2500 (1996). There, however, the permit contained a condition that was much more specific than that of Rule 5.1.f, stating that "notwithstanding the effluent limitations established by this permit, no wastes shall be discharged and no

Presumably, if West Virginia had elected to regulate its permittees more strictly than required by federal law, it would have engaged in an "extended discussion of the consequences of such a decision." *Piney Run*, 268 F.3d at 271.

But West Virginia engaged in no such discussion. The Permit does not warn the permit holder that the reference to Rule 5.1.f means that the permit holder must do more than meet its effluent limits. Nor was there any such discussion when West Virginia adopted Rule 5.1.f in 1984. JA 59, 64.[12] Prior to 1984, there was no rule that suggested permittees could potentially be held liable for violating water quality standards, and West Virginia provided no discussion or notice that Rule 5.1.f was designed to change that. JA 109-49. Consistent with this, when EPA reviewed and approved West Virginia's proposed rule package that included Rule 5.1.f, EPA observed that "[n]o substantive rights or obligations of any person will be altered by this program modification." Revision of W.Va.'s NPDES Program Transferring Authority Over Coal Mines and Coal Preparation Plants From the W.Va. Dep't of Natural Res. Div. of Water Res. to its Div. of Reclamation, 50 Fed. Reg. 2996 (Jan. 23, 1985); 50 Fed. Reg. 28,202 (July 11, 1985). Thus, the rule was never approved to have the effect given to it by the district court.

---

activities shall be conducted which will violate Water Quality Standards as adopted by [Oregon] except in the following defined mixing zone[.]" *Id*. at 985 (emphasis added).

[12] The rule was originally promulgated at Ch. 20, Art. 5A, § 10E.01(f) and was later renumbered as WVCSR § 47-30-5.1.f. JA 64.

The district court's decision presumes that West Virginia elected to regulate its permittees more strictly than required by federal law without any notice to regulated entities or discussion whatsoever. That decision conflicts with this Court's decision in *Piney Run*.[13]

### C. Fola is Shielded from CWA Liability

Because the extrinsic evidence demonstrates that West Virginia never intended to subject permittees who meet effluent limits to liability for violations of water quality standards, Fola enjoys the protections of the permit shield. As recognized by the Court in *Piney Run*, permit applicants who disclose their pollutants to the permitting agency and thereafter comply with the effluent limits in their NPDES permits are shielded from liability pursuant to CWA § 402(k). Here, Fola disclosed the presence of conductivity in its discharges and has complied with the effluent limits established by the WVDEP. JA 575. Fola is therefore shielded from liability.

[13] The district court's decision also conflicts with EPA's rules and the decision in *Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 12 F.3d 353 (2d Cir. 1993). There, the Second Circuit held that the federal citizen suit provision could not be used to enforce conditions of state NPDES permits that mandate "a greater scope of coverage than that required by the federal CWA[.]" *Id.* at 358-60 (quoting 40 C.F.R. §123.1(i)(2)). To the extent Fola's Permit is read to require Fola to meet water quality standards—something not required by the federal CWA—that requirement mandates a greater scope of coverage than is required by EPA and cannot be enforced in a CWA citizen suit.

## II. THE DISTRICT COURT ERRED BY FINDING FOLA IN VIOLATION OF WATER QUALITY STANDARDS CREATED BY THE DISTRICT COURT

After declaring that West Virginia does not shield permit holders who comply with effluent limits, the district court turned to the next question posed by OVEC's lawsuit: were Fola's discharges of "conductivity" causing a violation of water quality standards? Not surprisingly, this proved to be a difficult question to answer. Congress recognized more than forty years ago that it is "difficult to formulate precise water quality standards and even more difficult to prove that a particular operator's discharge reduced water quality below these standards." *Piney Run*, 268 F.3d at 264. Indeed, that is why Congress "shifted the focus away from water quality standards" in the first place. *Id*. at 265. But once the district court shifted the focus back to water quality standards, it felt obliged to forge ahead and determine whether Fola was in fact violating those standards.

To answer the question, the district court first had to determine just what the water quality standards were. OVEC alleged that Fola was violating narrative standards that prohibit wastes that "cause…or materially contribute to conditions in which the materials either are…harmful…to man, animal or aquatic life" or result in "significant adverse impact to the chemical, physical, hydrologic or biological components of the aquatic ecosystem[.]" WVCSR §§47-2-3.2.e & 3.2.i. Not surprisingly, the district court found these standards to be ambiguous. *Elk Run*,



4811-7005-5216.v2

24 F.Supp.3d at 545. So, the district court decreed that compliance with the narrative standards would be measured by the WVSCI. *Id*. at 556.

The district court then had to determine whether Fola's discharges of "conductivity" were causing failing WVSCI scores. This too would prove difficult. Congress long ago recognized the difficulties of proving "a causal link between the degradation of water quality and the pollutant in question." *Piney Run*, 268 F.3d at 265. To compound the problem here, conductivity is not commonly regulated. Scientific studies about its possible impacts have only emerged in the last decade, particularly in the last five years. Indeed, conductivity is not even a pollutant, but rather only represents the presence of an unspecified mix of ions. JA 556.

Forging ahead, the district court held a trial to determine whether conductivity in Fola's discharges was causing WVSCI scores to fall below the district court's standard. The trial took four days and featured five competing experts. OVEC's experts opined that recent scientific studies—almost all of which were published after Fola received its permit—showed that Fola's conductivity was the cause of failing WVSCI scores. Fola's experts opined that failing WVSCI scores were more likely due to commonly understood impacts to aquatic insects, such as poor habitat and high temperatures. JA 541-42.

More than five months later, the district court revealed the answer. A "preponderance of the evidence" showed that Fola's discharges of conductivity



4811-7005-5216.v2

were "causing—or, at the very least—materially contributing to" failing WVSCI scores. JA 611. The district court subsequently ordered Fola to take steps necessary to achieve the district court's definition of compliance with the narrative standards—a WVSCI score below 68 or conductivity below 300 µS/cm. JA 1225.

As explained below, this process was unlawful and unfair. Fola was never given fair notice that it would be held to the standards imposed by the district court. Indeed, those standards were developed by the district court *during the course of the litigation* and Fola did not learn that it was in violation of those standards until five months after a complicated trial. Congress did not intend for the CWA to work this way. *See* NPDES; Revision of Regulations, 44 Fed. Reg. 32,854, 32,863 (June 7, 1979) ("Congress intended that prosecution for permit violations be swift and simple" and "should not be bogged down in administrative determinations or showing of fault.").

### A. Fola Was Deprived of Fair Notice

NPDES permit holders are entitled to "fair notice" of the limits their discharges must comply with before they can be liable in an enforcement action. *See, e.g. Wisconsin Res. Prot. Council v. Flambeau Min. Co.*, 727 F.3d 700, 707 (7th Cir. 2013) ("cardinal rule[] of administrative law" that "a regulated party must be given 'fair warning' of what conduct is prohibited or required of it") (quoting *Rollins Envtl. Servs. (NJ), Inc. v. EPA*, 937 F.2d 649, 655 (D.C. Cir. 1991)). *See*

*also U.S. v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997) (rule authorizing civil penalties must give fair notice of required or prohibited conduct as well as clear standards of culpability). Private parties are entitled to rely on "duly-enacted, and therefore presumptively legitimate, statute[s]" and regulations, so long as such reliance is reasonable. *Cohn v. G. D. Searle & Co.*, 784 F.2d 460, 464 (3d Cir. 1986). "In determining whether a party received fair notice, courts frequently look to the regulations and other agency guidance." *Flambeau*, 727 F.3d at 708.

Here, it was reasonable for Fola to presume that it did not have to limit conductivity in its discharges in order to meet a particular WVSCI score. The permitting authority, WVDEP, had issued guidance advising that it would not impose a conductivity standard on permit holders. JA 1015-22. Likewise, West Virginia had made it clear that compliance with its narrative water quality standards would not be measured by the WVSCI. *Id*. Also, WVDEP had specifically informed Fola and OVEC that NPDES permits in West Virginia do not impose direct liability for violations of water quality standards not reduced to effluent limits. JA 88-89. Nothing in Fola's permit, which was reissued in 2009, provided any express statement to the contrary.

The district court was unmoved by all of this. In holding Fola liable, the district court relied primarily on the testimony of experts regarding the EPA

Benchmark and other novel scientific studies that *did not even exist* when Fola's Permit was reissued in 2009. JA 578, 582, 585, 592, 594-600 (all but one scientific study cited by district court published between 2010 and 2014). In the district court's view, permit holders can be sued whenever new science is published suggesting that permit limits need to be tightened and may not know whether they are in compliance with their permits until *after* a lengthy trial process.

Such a view is wrong. Congress designed the CWA to "to relieve [permit holders] of having to litigate in an enforcement action the question of whether their permits are sufficiently strict." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n. 28 (1977). It is the responsibility of the permitting authority to understand its regulations and draft permits that are sufficiently strict, not the job of the permit holder "to search…applicable regulations and correctly apply them." 45 Fed. Reg. at 33,312. The process laid out by Congress was intended to provide "permittees with maximum certainty during the fixed terms of their permits." *Id*. at 33,311. The district court's actions were inconsistent with the CWA and principles of "fair notice" that provide permit holders due process.

### B. The District Court Erred by Using the WVSCI as the Measure of Compliance with the Narrative Standards

OVEC alleged that Fola's discharges of conductivity were violating West Virginia's narrative standards. The district court found that these standards were

ambiguous and decreed that compliance would be measured by the WVSCI. JA 389, 573-74 (citing *Elk Run*, 24 F.Supp.3d at 545, 556). This was also error.

Congress left the role of developing and interpreting water quality standards to the States. 33 U.S.C. §§ 1311(b)(1)(C) & 1313. *See also Ky. Waterways Alliance v. Johnson*, 540 F.3d 466, 493 (6th Cir. 2008); *Defenders of Wildlife v. EPA*, 415 F.3d 1121, 1127-28 (10th Cir. 2005). The district court usurped that role when it used the WVSCI as the measure of compliance with West Virginia's narrative standards. The adoption of a numeric tool like the WVSCI to define compliance *in and of itself* constitutes the adoption of a water quality standard, which is required to undergo State rulemaking and EPA approval.[14] The WVSCI, though, has undergone none of these approvals.

Indeed, the district court disregarded the express wishes of West Virginia when it used the WVSCI to measure compliance. WVDEP has issued regulatory guidance requiring more than a WVSCI score to determine that a violation of West Virginia's water quality standards has occurred. JA 1017-19. Consistent with this, the West Virginia Legislature has ordered WVDEP to develop a methodology that

---

[14] 40 C.F.R. §§ 25.10(b), 131.6(e), 131.20(c) & 131.21. *See also Simpson Tacoma Kraft v. Dep't. of Ecology,* 835 F.2d 1030 (Wash. 1992) (state's attempt to translate narrative standard into numeric criterion invalid absent rulemaking); *Florida Clean Water Network, Inc. v. EPA*, No. 4:09CV165, 2012 WL 1072216 at *3 (N.D. Fla. March 30, 2012) (provisions that affect attainment decisions by State and define level of protection are water quality standards).

evaluates fish rather than just insects. *See supra* at 14-15. In addition, historically WVDEP viewed a WVSCI score below 60.6 as evidence of impairment, not a WVSCI score of 68. *See supra* at 13. The district court, though, disregarded all of this and found that narrative standards were violated when WVSCI scores fell below 68.

The manner in which the district court dismissed West Virginia's views was troubling. Congress did not intend to allow CWA citizen suits "to affect policy choices made by administrative agencies or others." *U.S. v. Metro. Dist. Comm'n*, 679 F.Supp. 1154, 1163 (D.Mass. 1988) (quoting S. Rep. No. 92-414 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3746) (internal quotations omitted). To the contrary, Congress intended that the "participation of citizens in the courts seeking enforcement of water pollution control requirements should not result in inconsistent policy with that of administrative agencies charged with enforcement [of those requirements.]". *Id.*

Congress was also clear that it did not want district courts in the business of developing water quality standards. Instead, Congress provided that the citizen suit provision:

> would not substitute a "common law" or court-developed definition of water quality. An alleged violation of an effluent control limitation or standard would not require reanalysis of technological [or] other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the

> establishment of such effluent control provision. Therefore, an objective evidentiary standard will have to be met by any citizen who brings an action under this section.

S. Rep. No. 92-414 (1971), reprinted in 1972 U.S.C.C.A.N. 3675, 3745. *See also*, *New York v. United States*, 620 F.Supp. 373, 374 (E.D.N.Y. 1985) ("[W]e conclude that Congress did not wish to authorize suits…that would require the courts to develop their own definition of what are prohibitive levels of water pollution."). The district court was wrong to impose WVSCI as a water quality standard, especially when it did so over the wishes of West Virginia.

### C. The District Court Erred by Imposing a Limit on Conductivity

After adopting WVSCI as the measure of compliance with West Virginia's narrative standards, the district court determined that conductivity from Fola's discharges was "causing" or "at the very least materially contributing to" failing WVSCI scores. JA 611. Based on this determination, the district court ordered Fola to either reduce the conductivity in Stillhouse Branch to 300 µS/cm or to achieve passing WVSCI scores. JA 1225.

In doing so, the district court erred in two additional ways. First, the district court made the same mistake with conductivity that it made with respect to the WVSCI: it illegally adopted a water quality standard. A water quality standard for conductivity has never been adopted in West Virginia. Indeed, as described above, West Virginia has specifically rejected the notion that conductivity is causally

linked to impairment. *See supra* at 14. While EPA found evidence of such a link, it expressly provided that its Benchmark "may not be the basis for an enforcement action against a regulated entity." *See supra* at 16. Nonetheless, even though West Virginia has rejected and EPA has never approved a conductivity standard, the district court applied a conductivity limit on Fola's discharges anyway.

Second, the district court erred by regulating a parameter—conductivity—that is not a pollutant. An essential element of a citizen suit is identification of a "pollutant" that is causing the violation. *See Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 488 (2d Cir. 2001) (CWA plaintiffs must "identify with reasonable particularity each pollutant that the defendant is alleged to have discharged unlawfully"). Here, the identification of a particular pollutant was essential to OVEC's claims.[15] But the district court acknowledged (and OVEC agreed) that conductivity itself is not a pollutant. JA 556 ("As an initial matter, the Court agrees that in order to prevail Plaintiffs are required to show a discharge of a pollutant that causes or materially contributes to impairment. The Court further recognizes that conductivity itself is not a pollutant,

[15] Rule 5.1.f provided that "discharges" are to be of such quality so as not to violate applicable standards. A "discharge" is defined as the "discharge of a pollutant." WVCSR §§ 47-30-5.1.f & -2.16. *See also* 33 U.S.C. § 1362(16) ("discharge" means "discharge of a pollutant").

but rather is a measure of ionic pollution, which depending on composition, may or may not cause or materially contribute to impairment.”).

The district court tried to fix this deficiency by using conductivity as a “proxy” for the unidentified mix of ions that cause increased conductivity. JA 570. However, the district court lacked the authority to do so. EPA’s permitting rules only authorize regulation of “indicator parameters” in certain narrow circumstances that were not present here. Before imposing an effluent limit on an indicator parameter to protect a narrative water quality standard, the permitting authority must demonstrate that the proxy or surrogate parameter is a proper indicator for the pollutant(s) that actually cause the violation of the standard. 40 C.F.R. § 122.44(d)(vi) (requiring identification of a “specific chemical pollutant” for which the indicator is being used and the level at which the specific chemical pollutant causes an excursion of the narrative standard).

The district court, however, rejected the notion that it had to follow these rules. It decided that the permitting rules—and the fair notice they provide a permit holder—could be dispensed with in the context of a citizen suit. JA 569. This, however, was error. A permitting authority cannot regulate a non-pollutant if not expressly authorized by the CWA. *See, e.g., Va. Dept. of Transp. v. EPA,* No. 1:12-cv-775, 2013 WL 53741 at *5 (E.D.Va. Jan. 3, 2013) (EPA prohibited from regulating stormwater, a non-pollutant, as a surrogate for sediment where CWA

restricts regulation to "pollutants"). The district court failed to explain why it was authorized to impose a limit on conductivity when permitting rules would not allow a permitting authority to do so.

## III. IF THE DISTRICT COURT'S RULINGS ARE CONSTRUED AS FINDING FOLA LIABLE FOR VIOLATIONS UNDER SMCRA, THOSE RULINGS WERE WRONG AS A MATTER OF LAW AND SHOULD BE REVERSED

The district court did not expressly state in any of its rulings that Fola violated SMCRA. However, in its January 17, 2015 order, after the trial in the liability phase, the district court concluded that Fola had "committed at least one violation of its permits" by violating "the narrative water quality standards incorporated into those permits." JA 571. Since there is only one CWA permit at issue in this case, the district court's reference to "permits" may have been intended to refer to both Fola's NPDES Permit and its SMCRA permit. This is unclear, however, since nowhere in its rulings did the district court discuss Fola's SMCRA permit, nor was any evidence introduced by OVEC regarding the terms and conditions of that permit. However, to the extent that the district court's rulings are interpreted by this Court as finding Fola liable under SMCRA, that conclusion was wrong as a matter of law.

In its Complaint, OVEC alleged that Fola's discharges of conductivity violated the terms and conditions of its SCMRA permit, which OVEC alleged prohibits discharges that violate water quality standards. JA 37-38. However, since

Fola is shielded from liability under CWA § 402(k), Fola cannot be found liable under SMCRA. SMCRA expressly provides that nothing in the Act shall be construed as superseding, amending, or modifying any provision of the CWA, state laws enacted pursuant to the CWA, or their implementing rules. 30 U.S.C. § 1292(a)(3). To hold Fola liable for discharges of conductivity under SMCRA when it cannot be held liable for those discharges under the CWA would violate this provision.

Section 1292(a)(3) has long been construed to prohibit the adoption of effluent limits under SMCRA that are more stringent than those imposed by EPA or states under the CWA. *See In re Permanent Surface Mining Regulation Litigation*, 627 F.2d 1346, 1366-69 (D.C. Cir. 1980) More recently, the Sixth Circuit similarly held that "where there is regulatory overlap" between the CWA and SMCRA, "the CWA and its regulatory framework control, so as to afford consistent standards nationwide." *ICG Hazard*, 781 F.3d at 291. Thus, where a discharger is protected by the CWA's permit shield, SMCRA cannot be used as an alternative vehicle to enforce water quality standards. *Id*. at 290-92. To the extent the district court ruled that Fola is liable under SMCRA as well as the CWA, the logic of the Sixth Circuit's ruling should control.

## **REQUEST FOR ORAL ARGUMENT**

Fola requests oral argument in this case. Oral argument is warranted because this appeal is not frivolous, the dispositive issues have not been authoritatively decided, and the decisional process would be significantly aided by oral argument given the complexity of the issues raised and procedural history of the case.

## **CONCLUSION**

For the foregoing reasons, the orders of the district court referenced in the Jurisdictional Statement herein should be reversed.

Respectfully submitted,

/s/ *M. Shane Harvey*
M. SHANE HARVEY
ROBERT G. McLUSKY
JENNIFER L. HUGHES
JACKSON KELLY PLLC
500 Lee Street E, Suite 1600
P.O. Box 553
Charleston, West Virginia 25322
*Counsel for Fola Coal Company, LLC*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 16-1024 **Caption:** Ohio Valley Envtl. Coal, Inc., v. Fola Coal Company, LL(

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**

Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   ☑ this brief contains 13,261 [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐ this brief uses a monospaced typeface and contains ____________ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this brief has been prepared in a proportionally spaced typeface using Microsoft Word [*identify word processing program*] in 14 pt. Times New Roman [*identify font size and type style*]; **or**

   ☐ this brief has been prepared in a monospaced typeface using ____________ [*identify word processing program*] in ____________ [*identify font size and type style*].

(s) Jennifer L. Hughes

Attorney for Fola Coal Company, LLC

Dated: April 13, 2016

# CERTIFICATE OF SERVICE

I certify that on 4/13/2016 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/Jennifer L. Hughes
Signature

April 13, 2016
Date